UNION TRUST COMPANY *v.* WEBBER-SEELY HARDWARE COMPANY.

Opinion delivered January 14, 1905.

1. SALE—UNAVOIDABLE CONTINGENCY.—An unexpected scarcity of axe material and difficulty in securing labor, making the demand for axes greater than the supply, does not constitute an "unavoidable contingency," within the meaning of a contract for shipment of axes which provided that the order was accepted subject to unavoidable contingencies, if the evidence showed that the seller could have furnished the axes within a time satisfactory to the buyer, provided the latter accepted them in small shipments, and that the failure to deliver the goods was due to a difference between the buyer and seller as to how the shipments should be made.  (Page 588.)

2. SAME—MODE OF SHIPMENT.—If it be conceded that in the case of a contract for the shipment of 450 dozen axes, amounting to a carload, parol evidence is admissible to prove a usage of trade authorizing shipment in lots less than a carload, yet where the seller frequently offered small shipments, but promised a carload later, and the buyer declined to accept the small shipment, but demanded a carload shipment, the seller cannot, after a delay of several months, and after the price of axes has risen, change its course of conduct and refuse to ship save in small lots.  (Page 588.)

3. SAME—PAYMENT.—Where an acceptance of an order for goods stipulated that settlement should be made therefor within thirty days from the date of shipment by four months' note from date of shipment or by cash, the buyer had a right to require the entire shipment to be made before making settlement.  (Page 589.)

Appeal from Sebastian Circuit Court, Fort Smith District.

STYLES T. ROWE, Judge.

Affirmed.

The appellant, representing the Kelley Axe Manufacturing Co., sued appellee in a justice's court at Fort Smith, on an account for axes delivered, for $132.50. The appellee answered, admitting indebtedness for the axes, but alleged that the Axe Company was indebted to it in the sum of $300 for breach of a contract of sale of 450 dozen axes, the account sued on being for 25 dozen of them; and asked judgment over for the difference. After judgment in the justice's court the case was tried in the circuit court before the judge sitting as a jury, and resulted in judgment for defendant Hardware Company against the Axe Company's receiver and the surety on its appeal bond in the sum of $187.90, after offsetting the amount due for the axes delivered. The Axe Company appealed to this court.

The contract in question resulted from correspondence, and is embraced in a letter of the Hardware Company to the Axe Company, dated May 26, 1899, ordering 450 dozen axes therein described at prices previously quoted, which order was accepted May 28, 1899. Four hundred dozen weigh about 24,000 pounds. Until a short time before this order was made, under railroad rules a car of axes was 24,000 pounds, but prior to the making of the contract the rule was changed to 30,000 pounds. The effect of this would be to require payment of freight at rate of 30,000, although 24,000, or any less weight, actually made the car load.

The material parts of the contract bearing on this controversy are these (contained in letter quoting prices and terms):

"Terms: All axes f. o. b. cars, factory; settlement to be made within thirty days from date of shipment by four months' note from date of shipment, or cash, less 3 per cent. Axes not warranted. Quotations subject to change without notice. Prices guarantied against ourselves only, and up to date of shipment only. Orders accepted subject to strikes, fire and unavoidable contingencies."

Evidence was introduced to the effect that under this contract the usage of the trade would permit the Axe Company to ship in less quantities than carload. The trial court heard this evidence, but held it incompetent to explain the contract. Evidence was introduced that there was a great scarcity of axe

material, and great difficulty in securing labor to manufacture axes in the year 1899, beginning after the date of this contract and continuing till past the fall of 1899, producing unprecedented condition in the manufacture of axes. The effect of it was that the demand for axes was greater than the capacity of the axe manufacturers to supply it, thereby producing scarcity of material, high prices therefor and difficulty in procuring sufficient workmen.

On June 14 the Axe Company shipped 25 dozen axes by local freight to the Hardware Company. The latter wrote the Axe Company on the 19th of June, saying they presumed the carload was delayed, and that they had sent this quantity for immediate use. Replying to this, on June 21, the Axe Company wrote that they were so overwhelmed with orders that it would be impossible to get off a solid carload for some time, and therefore took it for granted that the Hardware Company would prefer that they keep shipping small lots, rather than wait, and asking if this was satisfactory. On the 22d of June the Hardware Company replied that they could make no profit on the axes if they had to pay local freight (as would be in case in less than carload lots). They said that if the Axe Company would pay the difference between the local and car rate it would enable the Hardware Company to make its profit, and, in conclusion, asked for a full carload. Replying to this on 26th of June, the Axe Company gave a full account of the unprecedented condition of the business, and then said of this order that it would be impossible to ship all these goods in one lot "until towards fall," and the only way to keep the Hardware Company supplied would be to send them forward in local shipments from time to time during the summer. Replying to this on June 28, the Hardware Company reiterated that it could not pay local freight, and asked the Axe Company to write when it could make up a car of axes and ship it. Replying on July 1, the Axe Company said that it would be utterly impossible to get off the entire carload of axes before fall, and repeated its offer to forward small shipments. On July 8 the Hardware Company asked the Axe Company if it could forward the carload by last of August or first of September. On July 10 the Axe Company replied it could not be done by either of those dates. On July 12 the Hardware Company asked if the car of axes could be shipped

before October 1, and on July 15 the Axe Company replied, stating how far it and other axe concerns were behind with their orders. These letters contained other matters immaterial to the issues. The next letter was one from the Hardware Company to the Axe Company, dated March 4, 1899, referring to several statements sent of the bill for the 25 dozen axes delivered in June, amounting to $132.50. It is said that they declined to pay it, as the Axe Company had failed to perform its part of the contract; and that it was waiting for its car of axes, and was ready to pay the bill with interest for the overtime when it got its car, and demanded immediate shipment. More correspondence followed, the Hardware Company demanding the carload of axes and claiming that this bill was not due till balance was shipped, and offering to deposit the amount of it in bank with interest to be paid on receipt of bill of lading for the car; and the Axe Company demanded payment of its past due bill, as it claims, before proceeding further with any shipments. Finally, on November 21, the Axe Company took the position that it did not agree to deliver a carload at any one time, and that it took the order subject to the conditions of "unavoidable contingencies," and offered, if the Hardware Company would pay this account, that it would go ahead and ship in local shipments the balance of the axes, and it thought within two months the order could be all filled. The prices of axes had greatly advanced from the time of the contract to this culmination of the controversy.

In the testimony of the president of the Axe Company he was asked why the Axe Company could not have taken out the axes for the Hardware Company, and put them aside till a car accumulated, and then shipped it, and he replied that they could have done so if the Hardware Company had requested it, but they never requested them to do anything of the kind, but asked for the goods at once. He also testified that his works were closed for six weeks from April 15, to June 1, 1893, for enlargement and improvement of the plant. The president further said that, had the Hardware Company permitted the shipments to have been made in small lots, they would probably have filled the order before the end of the year.

*Winchester & Martin,* for appellant.

The party at fault cannot be heard to complain.    27 Ark. 61 ; 7 Am. & Eng. Enc. Law (2d Ed.), 151. It was error to refuse to permit plaintiff to introduce the offered testimony tending to show that it was a universal custom of axe manufacturers to ship in broken lots, unless otherwise ordered.    46 Ark. 210; 58 Ark. 574; 46 Ark. 222; 19 Ark. 270.    The exception in the contract for "unavoidable contingencies" was as much a part of it as any other stipulation.    121 Fed. 609; 58 N. Y. 573; 49 N. E. 629.

*Mechem & Bryant,* for appellee.

The contract was an entirety, and the defendant was not liable until the delivery was complete.    121 N. Y. 288.    The Axe Company was not entitled to recovery for the installment delivered.    2 Suth. Dam. (1st Ed.), 356-7.

Hill, C. J., (after stating the facts.)  1. It is contended that the "unavoidable contingency" clause relieved the Axe Company from an earlier fulfillment of the order.  The evidence of the Axe Company, however, showed that it could have furnished the axes within a time satisfactory to the Hardware Company if the Hardware Company had accepted them in small shipments from time to time.  Therefore the failure to have the goods delivered was due to the difference between the companies as to how shipments should be made, and not to the stress in the manufacturing of the goods.

2.  Should the shipment have been in a carload or in smaller lots from time to time?  The contract itself is silent; and as it is an entire contract, naturally it would be expected to be an entire delivery, if practicable.  The Axe Company proved that in the trade such an order gave the manufacturer the right to ship from time to time.  Conceding, without deciding, that the contract was sufficiently ambiguous or technical to let in an usage to explain it, the result is not affected.  The price of axes was increasing, and the Hardware Company naturally wanted the contract fulfilled, but did not want to pay the additional freight required by reason of these small shipments.  It insisted that it was entitled to a carload, and would not receive the goods

otherwise. The Axe Company frequently offered the small shipments, but always promised a car later, and urged that the small shipments be accepted, as there would be so much delay in the car being furnished; indicating first early in the fall and then late in the fall before the car would be ready. Just as fall was about to turn into winter, the Axe Company discovers it never agreed to furnish the goods in a carload lot. All of this time the Hardware Company was refusing the small shipments to save freights, and waiting for the carload. The market had then risen. Clearly, the Axe Company could not at that late date change its course of conduct.

3. The order was an entire one, for the amount of goods therein specified at the prices therein named. The shipment, the settlement, the payment each refer to the order as a whole, and not to fractions thereof. The Hardware Company had a right to exact a fulfillment of the Axe Company's contract to deliver these goods before it made settlement therefor. If the Axe Company elected to deliver in various amounts and at various times, that could not affect the question of payment. The method of shipment in carload or smaller shipments only reached to the manner of delivery, not to the question of payment. Only after complying with its contract to deliver the goods bought could the Axe Company call upon the Hardware Company for payment. It called for payment of a part delivered, and refused to deliver the balance until this was paid. In this the Axe Company violated the contract. The Court of Appeals of New York placed the same construction on a similar contract. *Nightingale* v. *Eiseman*, 121 N. Y. 288. It results from these views that the judgment should be affirmed, and it is so ordered.